UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES DONELSON, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 1249 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DARRISE HARDY and WEXFORD HEALTH SOURCES, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Charles Donelson, an Illinois prisoner and frequent litigant, brought this suit against several defendants regarding medical treatment he received while at the Stateville Correctional Center. The court recruited counsel to represent Donelson, Doc. 36, but allowed counsel to withdraw due to a professional conflict involving a newly named defendant, Doc. 90. The court recruited another counsel to represent Donelson, Doc. 91, but allowed that counsel to withdraw due to Donelson's uncooperative behavior, Docs. 146, 153; *see also In re Donelson*, No. 16 C 7410 (N.D. Ill.), Dkt. 1 (Executive Committee order restricting Donelson's ability to file additional suits). For the reasons set forth below, Donelson's abusive behavior in this suit warrants the sanction of dismissal with prejudice.

    A.    **Background**

After years of litigation, Wexford Health Sources and its then-employee, Nurse Darrise Hardy, are the only remaining defendants. Donelson alleges that Hardy violated his Eighth Amendment rights in conducting a medical intake screening upon his arrival at Stateville's Northern Reception and Classification Center on December 30, 2013. Donelson also alleges that

1

Hardy provided constitutionally inadequate medical care to retaliate against him for filing a lawsuit against a correctional officer who was, at that time, her romantic partner. Defendants moved for summary judgment and filed a Local Rule 56.1(a)(3) statement attaching the transcript of Donelson's deposition. Docs. 360, 361, 361-1. During briefing on the summary judgment motion, the court *sua sponte* directed Donelson to show cause why this case should not be dismissed with prejudice based on his conduct during his deposition. Doc. 379. Donelson responded to the show cause order, and, in the meantime, briefing on the summary judgment motion concluded.

The court issued the show cause order because Donelson's conduct during his deposition appeared to be intentionally inappropriate and obstructive behavior. The court's order referenced several illustrative excerpts from the 182-page deposition transcript. The court reproduces them here to provide context for Donelson's attempts to explain his conduct:

> Q: Have you received medical care at any Illinois Department of Corrections prison prior to December 30th, 2013?
>
> A. I don't understand your question.
>
> Q. Do you understand that December 30th, 2013 is a date?
>
> A. Yes, I understand that is the date that this incident occurred.
>
> Q. Wonderful. Before this incident occurred—
>
> A. I object to that.
>
> Q. I haven't finished my question. Before this incident occurred, sir, have you ever received medical attention at an Illinois Department of Corrections prison?
>
> A. I don't recall. I don't understand your question.
>
> Q. When did you first enter Stateville NRC in your life?

A. What do you mean by my life?

Q. The date—from the date you were born until we sit here today, sir, what was the first date, and if you can't give me the date, you can give me the approximate year that you entered Stateville NRC?

A. I entered NRC December 30th, 2013.

Q. Is it your testimony that prior to December 30th, 2013, you had never been in Stateville NRC in your life, meaning date of birth until December 30th, 2013?

A. I do not understand that question.

Q. Sir, I cannot phrase that anymore specifically. From the date you were born, until December 30th, 2013, had you ever been at Stateville Northern Reception and Classification Center?

A. I don't understand that question.

Q. Had you physically had your body inside Stateville NRC from the date of your birth until any date prior to December 30th, 2013?

A. I don't understand the question.

Q. Sir, what additional information would you require to better understand my question?

A. That's for you say. I don't understand the question.

Q. Sir, I will go ahead and say I don't know what additional information I can possibly give. We have established we know your date of birth. I would assume you know your life. We further established that you understand what Stateville NRC is. I think a reasonable human being would understand what being inside prison means. So with those stipulations, have you ever been in Stateville NRC prior to December 30th, 2013?

A. I don't understand the question.

* * *

Q. How do you get medical care at the prison, let me ask you that?

3

A. They don't give you medical care in prison.

Q. You are holding an inhaler right now, so clearly you did get medical care at some point. How did you get that?

A. You gave it to me.

Q. I personally gave that to you?

A. Yes. That is your contraband.

Q. Sir, what are you talking about? You are saying that is my inhaler?

A. Yeah. Do you want it?

* * *

Q. Let's try this again. Sir, you have an inhaler in your hands right now.

A. Yes.

Q. Where did you get that inhaler?

A. This inhaler was provided to me by, I assume Wexford.

Q. Who gave it to you? You can't go to like a Walgreens down the street and get it, so who gave you that?

A. It was a nurse that brought it to me.

Q. So you received that while you were in prison, correct?

A. I received it originally, yes.

Q. So you have to agree with me at some point in your life you have received medical care in the Department of Corrections prison, correct?

A. When you say life, sir, you have to be more defined. You have to describe exactly what you mean by life. I have not been here my life.

Q. But you have been here for portions of your life, correct?

A. That is irrelevant, but the fact that you say life, you have to be specific. I have been in prison since, according to your record that you just tried to show me the exhibit that said December 30th, 2013.

Q: Sir, I was actually, from my record, arguing you have been in prison since 1998.

* * *

Q. I just want yes or no. You have received medical treatment at an Illinois Department of Corrections prison at some point in your life?

A. Perhaps you called up here and told them to prescribe it to me.

Q. Sir, this is the third time I am going to ask the question. I am candid when I say I don't know how I can phrase this anymore simply than what I am asking. You have an inhaler in your hand. You are in prison. You cannot go down the street to a Walgreens or a CVS and get that inhaler. What I would like to know is, have you received at any point in your life, and I will agree you have not been in prison your whole life, but you have been in prison for portions of your life, so I am asking, at any time that you have been in an Illinois Department of Corrections prison have you received medical care?

A. Inadequate treatment.

Q. Yes or no, have you received medical care consistent with the question I have asked four times?

A. Inadequate treatment.

Q. So that means yes, you have received medical care, is that correct?

A. Inadequate treatment.

Doc. 360-1 at 6-7, 9-11.

### B. Donelson's Response to the Show Cause Order

Donelson's response to the show cause order offers this explanation for his conduct at the deposition:

> As the question plays out counsel was saying he was talking about 1998 prison and had plaintiff been in Stateville NRC in my life. To this end the Court must consider the record and that this Court, Cox, Feinerman, Gilbert

5

> told me to stick to the merit of this case. I was saying I don't recall my case being about other claims and I did not understand the question as asked. I believe counsel understood that and shift to asking when did I first enter Stateville NRC I answered him so he said prior to 12-30-13 I did not understand. Because the case I was instructed not to talk about had been void, vacated, and was pending. Same goes for the question how do I get medical care at the prison I said they don't give you medical care in prison this goes to the fight I had to get an inhaler and how things change I believe counsel made that happen I said he gave it to me because of the problem to get it. I answered I only understood the claim in this case. In the transcript I told counsel I was not feeling well and consistent with my claims to this case. Plaintiff state he has not abused the judicial process nor conducted litigation in bad faith nor disobeyed a discovery order. Plaintiff attended the hearing and answered questions.

Doc. 383 at 2-3. This response is grossly insufficient.

First, Donelson contends that his answers were proper because the questions were confusing to him. That argument is not credible. Donelson has pursued at least 45 cases in three federal districts and numerous state venues. (The court will address at length Donelson's litigation history in its forthcoming order in *Donelson v. Tanner*, No. 17 C 8078 (N.D. Ill.).) In 2017 alone, Donelson filed over thirty motions and fourteen other documents in this case and participated in eight lengthy hearings before Magistrate Judge Gilbert. His *pro se* submissions have been sufficient to partially survive summary judgment in at least two other cases. *See Donelson v. Shearing*, No. 15 C 0095 (S.D. Ill.), Dkt. 246 (medical care); *Donelson v. Atchison*, No. 14 C 1311 (S.D. Ill.), Dkt. 317 (conditions of confinement and retaliation). Donelson's litigation efforts demonstrate that he can understand basic questions like whether he had ever received medical treatment at an Illinois prison at any point in his life.

Second, the deposition transcript that Donelson attaches to his response—which is from another one of his cases—shows that he has the ability to understand and respond succinctly to questions as basic as those that defense counsel asked in this case. For example, in the other case,

Donelson testified that he arrived at the Menard Correctional Center on the date shown in his records. Doc. 383 at 12 (Q. "Well, you came to—you state in your complaint that you arrived at Menard on July 18th, 2012; is that correct?" A. "That's the second time I arrived at Menard. Correct."). In contrast, the following exchange occurred when defense counsel in this case asked Donelson to confirm when he arrived at Stateville's Northern Reception Center:

> Q. Sir, I show that your admission date was December 30th, 2013. Is that correct, sir?
>
> A. I don't understand that.
>
> Q. Sir, I see below here it says admission date 12/30/2013. What date were you admitted to Stateville NRC?
>
> A. I can't recall.
>
> Q. Sir, if I am showing you a document that says your admission date was 12/30/2013, does that refresh your recollection?
>
> A. What document are you referring to?
>
> Q. Sir, you have to let me finish my questions before you talk over me. Sir, I am showing you this document, Donelson 1, showing your admission date 12/30/2013. Does that refresh your recollection that you may have been admitted to the Department of Corrections on December 30th, 2013?
>
> A. That may be a date that I came to IDOC.
>
> Q. Do you dispute that you came to the IDOC on 12/30/13?
>
> A. It depends on what you mean by dispute.
>
> Q. I got a print out from a state website saying you came on December 30th, 2013. Are you telling me that date is incorrect, yes or no?
>
> A. I recall December 30th, 2013 is when your defendant denied me medical treatment.
>
> Q. So you would agree that you were at an IDOC facility on 12/30/13?

7

A. I was in NRC.

Doc. 361-1 at 4.

At his deposition in the other case, Donelson readily acknowledged the irrefutable fact of his incarceration. Doc. 383 at 12 (Q. "The case that's pending that you're concerned about … is that related to the—to the charge for which you're incarcerated?" A. "It is one of the bases of my incarceration."). In this case, by contrast, Donelson refused to answer questions about his incarceration, even testifying that he did not understand what is meant by being incarcerated:

> Q. Sir, I show that you have a custody date of January 4th, 1998. Is that correct?
>
> A. I don't understand that question.
>
> Q. Well, I will phrase it another way. On this sheet it says that you were in custody since January 4th, 1998 for a 44 year sentence for murder.
>
> A. Object to that question. Object to this documentation. I don't know anything about this.
>
> Q. Wonderful. Do you know when you were first incarcerated for a charge of murder?
>
> A. I don't recall.
>
> Q. Do you dispute that you were incarcerated for a charge of murder starting on January 4th, 1998?
>
> A. I object to this question.
>
> Q. Again, sir, you have to let me get my question out. The court reporter cannot take it down if we both talk all over each other. Are you disputing that you were incarcerated since 1998?
>
> A. Object to this question. I will not answer any more questions with regards to a criminal incarceration.
>
> Q. Sir, you will answer the questions consistent with the Federal Rules of Civil Procedure that I have asked. Sir, the reason I am asking this question is

that I see on here you have been in custody since 1998, but above here I see that you were only admitted to the DOC on 12/30/13. I am trying to understand why there is a discrepancy. I think I am completely in bounds in asking these questions. So sir, have you been incarcerated continuously since 1998?

A. You need to talk to the Illinois Department of Corrections about that.

Q. I am going to talk to you about it. Have you been incarcerated continuously since 1998?

A. I don't understand your question.

Q. What additional information would you require, sir, to understand that question?

A. I don't understand what you asked me.

Q. Do you understand what incarceration means?

A. No, I do not.

Q. I am sorry, sir, I couldn't hear your answer.

A. No, I do not.

Q. Okay. Let's say it this way, sir. Do you admit right now that you are currently in prison?

A. I am in jail.

Q. Okay. Well, you are in a prison, not a jail, but if I use the term prison to mean incarceration, will that help clarify for you?

A. I object to this line of questioning. It has no practical affect [sic] against this case.

Doc. 361-1 at 5.

At his deposition in the other case, Donelson summarized the basis for his claims without a lengthy argumentative prelude. Doc. 383 at 12 (Q. "Can you briefly kind of explain the basis of your complaint for me? I was reading through it and I think I understand the gist of it. But can

9

you kind of explain to me what you believe has occurred?" A. "Denial of medical treatment, deliberate indifference, and I'm still suffering today."). By contrast, the following exchange occurred when defense counsel in this case asked Donelson if he knew why he was being deposed:

> Q. Do you understand that you are here today to give testimony in a lawsuit that you have filed related to medical care received at Stateville NRC?
>
> A. What do you mean? I don't understand.
>
> Q. What do you think your lawsuit is about, sir?
>
> A. You asked a question. I asked you what do you mean.
>
> Q. And I am rephrasing the question to maybe get a better answer that we can both understand. My question was do you understand that you are here to give testimony today in a lawsuit that you have filed related to medical care? Yes or no.
>
> A. I am present here by order of the court.
>
> Q. What do you think your lawsuit is about?
>
> A. I don't understand your question, sir.
>
> Q. Mr. Donelson, I will represent I don't know how to phrase that anymore basically than, sir, what is your lawsuit about? You filed it. What is it about?
>
> A. The petition was filed by Terrence Mahoney [Donelson's recruited counsel for a time].
>
> Q. Did you discuss with Mr. Mahoney the nature of your lawsuit?
>
> A. Yes, I had a conversation with him about it.
>
> Q. So is your testimony today that despite prosecuting the case on your own since July of 2016, you do not know what your lawsuit is about, sir?
>
> A. That is not what I represent, sir.
>
> Q. My question was, what is your lawsuit about, and you said I don't know.

> A. I know what my lawsuit is about.
>
> Q. Please tell me what your lawsuit is about, Mr. Donelson?
>
> A. It's about being denied medical treatment.

Doc. 361-1 at 3. The bottom line is this: Donelson's claim of having been honestly confused during his deposition in this case is completely undermined by the deposition excerpt he provided from one of his other cases.

Third, Donelson asserts that his conduct complied with instructions by the undersigned judge, Magistrate Judge Cox, and Magistrate Judge Gilbert "to stick to the merit[s] of this case." Doc. 383 at 3-4. Donelson appears to be referring to hearings before Magistrate Judge Gilbert at which he interjected detailed information about unrelated cases and was told to focus on the claims raised in this case. Doc. 342 at 12-17. Suffice it to say, no judicial officer suggested to Donelson that he was free to disregard the rules governing depositions.

Fourth, Donelson contends that defense counsel agreed that he "did not understand" some of counsel's questions "as asked." Doc. 383 at 3. That contention is baseless. Counsel repeatedly attempted to secure responsive answers to simple questions. For instance, counsel asked Donelson: "From the date you were born, until December 30th, 2013, had you ever been at Stateville Northern Reception and Classification Center?" Doc. 361-1 at 7. Counsel followed up with no success after Donelson claimed confusion, asking: "Had you physically had your body inside Stateville NRC from the date of your birth until any date prior to December 30th, 2013?" *Ibid*. And immediately after that exchange, counsel stated: "Reserve all rights. The witness is being evasive and offering only conjecture. Dispute that the witness does not understand the question, based on his prior testimony." *Ibid*.

Fifth, Donelson suggests that he was justified in repeatedly responding "[i]nadequate treatment" when asked whether he had received "medical care" at any IDOC prison. Doc. 383 at 3. He is wrong. "Though courts are solicitous of *pro se* litigants," *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011), a litigant's unrepresented status does not mean that he can refuse to provide substantive answers at his own deposition, regardless of how he feels about the merits of his case. *See Naseer v. Racine Cnty.*, 2011 WL 5180941, at *2 (E.D. Wis. Oct. 28, 2011) (dismissing a *pro se* prisoner's suit based on his refusal to participate in a properly noticed videotaped deposition, and characterizing the prisoner's claim that he would have proceeded with a non-videotaped deposition as "merely an attempt to create post deposition justification for his failure to proceed" that did "not overcome his willful and bad faith behavior that arose at the time of the deposition").

Sixth, Donelson denies that he accused defense counsel of bringing a contraband asthma inhaler into Stateville and giving it to him. Instead, Donelson maintains that he was trying to convey that he had difficulty obtaining an inhaler at the NRC due to Hardy's allegedly unconstitutional intake screening. Donelson claims that he believed that defense counsel "made that happen"—that is, arranged for him to receive the inhaler he had at his deposition—and that this is what he meant when he said that counsel "gave" him the inhaler. Doc. 383 at 3; *see* Doc. 361-1 at 10 ("You gave [the inhaler] to me. … That is your contraband.").

This explanation is far-fetched, to say the least, and even more so considering the relevant timeline. Hardy was first mentioned—as Jane Doe—in Donelson's third amended complaint, which was filed on June 29, 2015. Doc. 82. The Stateville NRC intake screening occurred on December 30, 2013, and Donelson received an inhaler twenty days later. It therefore

12

was frivolous for Donelson to assert that defense counsel was responsible for his receiving an inhaler in January 2014 or that the inhaler Donelson brought to his deposition had any connection to defense counsel.

Seventh, Donelson appears to blame any shortcomings in his testimony on his health, saying that "he was not feeling well" that day. Doc. 383 at 7. True, Donelson was deposed in a room that was warm due to warm summer weather. Doc. 361-1 at 12. Also true is that Donelson testified that he was "suffering right now with serious tonsil issues and [an] ear infection." *Id*. at 8. But Donelson also responded, "I believe I am maybe" when asked if he was well enough to continue with his deposition. *Ibid*. Donelson also knew that he could—and he did—request breaks during his deposition, *id*. at 3, 18, and he even took an additional break by walking out of the deposition room without warning, *id*. at 8.

Moreover, despite his claimed ill health, Donelson's objections, tangents, and argumentative answers demonstrate that he had the capacity to sit for the deposition. For example, Donelson could have chosen to answer basic questions such as what he did to prepare for his deposition, *id*. at 2-3, whether he had ever received any piece of paper of any type from the prison, *id*. at 9, and whether he had ever seen Hardy before December 30, 2013, *id*. at 26. Donelson instead objected, professed confusion, and, when pressed, offered unrelated comments in response to any question he did not want to answer. *E.g.*, *id*. at 26-27 (calling defense counsel "a slick dog," claiming he did not understand the question "[h]ad you ever seen Nurse Hardy prior to December 30th, 2013," asserting a baseless relevance objection, and stating, "And that would be related to being incarcerated. I once again reflect back to the fact that there is a convoluted issue with this sentencing issue. … I am telling you there is a convoluted issue that I

am not able to fully answer that question because of the fact the sentencing have multiple dates, and there's an issue with that and my attorneys [sic] is involved."). Donelson's attempt to blame his health for his unacceptable conduct is meritless.

Eighth, Donelson denies that he harassed defense counsel or made a nuisance of himself. In support, he stresses that defense counsel "did not report any problem to this court." Doc. 383 at 4. The fact that defense counsel did not move for sanctions does not excuse Donelson's conduct. The court has the authority to impose sanctions regardless of whether defense counsel requests dismissal. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 n.8 (1991) ("The court generally may act *sua sponte* in imposing sanctions under the Rules."); *Johnson v. Cherry*, 422 F.3d 540, 551-52 (7th Cir. 2005) (holding that a court may *sua sponte* impose sanctions based on its inherent powers if it first provides notice and an opportunity to be heard). Notwithstanding defense counsel's considerable patience following an unquestionably challenging deposition, the court will not allow Donelson's conduct to pass without appropriate consequences.

In sum, Donelson's response to the show cause order does not come close to justifying his conduct at the deposition.

C. **The Appropriate Sanction**

The next question is whether dismissal or some lesser sanction is appropriate for Donelson's misconduct. "A court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct." *Rojas v. X Motorsport, Inc.*, 2017 WL 4281124, at *9 (N.D. Ill. Sept. 27, 2017) (quoting *Ramirez v. T & H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016)). Inherent authority sanctions are warranted if a party "has willfully

abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (citations omitted). In addition, under Civil Rule 37, the court may sanction a party—up to and including dismissal—for disobeying a discovery order. *See* Fed. R. Civ. P. 37(b)(2)(A); *Chambers*, 501 U.S. at 44-45.

The court issued orders authorizing Donelson's deposition, Docs. 153, 242, and Donelson testified that he understood that he was being deposed pursuant to a court order, Doc. 361-1 at 3. An incarcerated person's inappropriate conduct at a deposition conducted pursuant to an order authorizing that deposition can lead to sanctions. *See McClenton v. Walker*, 2008 WL 345533, at *2 (C.D. Ill. Feb. 6, 2008) (sanctioning an incarcerated deponent for his refusal "to answer any questions pertaining to his lawsuit despite the court's order"). In addition, the court may impose an appropriate sanction if a deponent "impedes, delays, or frustrates [his] fair examination." Fed. R. Civ. P. 30(d)(2).

Given the nature of Donelson's misconduct and the array of unpersuasive excuses offered in his response, a hearing is not necessary to assist the court in deciding upon a sanction. *See Ayoubi v. Dart*, 640 F. App'x 524, 528 (7th Cir. 2016). Donelson vigorously litigated this case for years. Unlike the many defendants who settled, Wexford and Hardy repeatedly rejected Donelson's invitations to engage in settlement discussions and instead deposed him in preparation for an anticipated summary judgment motion. Perhaps Donelson misbehaved at his deposition due to his dissatisfaction with the Wexford Defendants' approach to this litigation. But regardless of his precise motive, Donelson acted willfully and in bad faith. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) (holding that the district court, before imposing dismissal as a sanction for discovery violations or pursuant to its inherent powers, must

15

"find that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake").

Donelson's *pro se* status does not insulate him from sanctions. *See Secrease*, 800 F.3d at 401-02 (affirming dismissal with prejudice due to the *pro se* plaintiff's bad faith submission of falsified evidence); *Williams v. Wahner*, 714 F. App'x 601, 604 (7th Cir. 2018) (affirming dismissal with prejudice due to the *pro se* plaintiff's bad faith during discovery). And the court is not required to accept Donelson's unconvincing excuses for his conduct. *See Ayoubi*, 640 F. App'x at 528 (holding that a court need not accept explanations "crafted only to exonerate litigation misconduct").

A deposition obligates the deponent to provide sworn testimony regarding the subject of a lawsuit; it does not provide an opportunity to willfully disrupt the litigation process. Although the sanction of dismissal is severe, the court finds that it is proportional and appropriate given Donelson's grossly unacceptable conduct, the need to convey the seriousness of his violations, the obvious insufficiency of a verbal or written warning, and his present inability to pay any meaningful monetary sanction. "Dismissal with prejudice also sends a strong message to all litigants, particularly to those within the prison population," that abuse of the litigation process will not be tolerated. *Kennedy v. Huibregtse*, 831 F.3d 441, 444 (7th Cir. 2016) (affirming dismissal based on the plaintiff prisoner's failure to disclose assets in an outside account). Moreover, given Donelson's abusive conduct, it would be inappropriate to reward him with a detailed analysis of the merits of his claims on summary judgment.[*]

---

[*] The court briefly notes that the Wexford Defendants' summary judgment motion, which they supported with a statement of undisputed material facts that complies with Local Rule 56.1(a)(3),

The court does not impose this sanction in a vacuum, as Donelson's improper tactics began long before he was deposed. As Donelson accurately put it during a June 20, 2017 status hearing before Magistrate Judge Gilbert, he is proceeding *pro se* because he "chased off counsel." Donelson also took inappropriately aggressive discovery positions before Magistrate Judge Gilbert, who spent hours—including during a lengthy status hearing—trying to address his frequently shifting and contradictory requests and at times false denials that he had received mail sent to his address of record. That said, even if Donelson had litigated this case without incident before his deposition, his conduct at the deposition would have sufficed on its own to warrant dismissal.

\* \* \*

This suit is dismissed with prejudice. Final judgment shall enter. If Donelson wishes to appeal, he must file a notice of appeal with this court within thirty days of the entry of judgment. *See* Fed. R. App. 4(a)(1). If Donelson appeals, he will be liable for the $505 appellate filing fee

---

Doc. 361, turns on whether Hardy violated Donelson's constitutional rights when she conducted an intake screening and determined that his condition was routine rather than urgent. Doc. 362 at 1-2. In opposing summary judgment, Donelson asserts at length, without evidentiary support, that the intake medical records supporting Hardy's assessment are inaccurate because he was suffering from an acute asthma attack and that she was unqualified to conduct medical assessments. Doc. 377 at 14-20, 26-30. Because Donelson's response to the Wexford Defendants' Local Rule 56.1(a)(3) statement fails to support any of his denials with citations to the record, as required by Local Rule 56.1(b)(3)(B), the court on summary judgment would deem admitted the facts asserted in the Wexford Defendants' Local Rule 56.1(a)(3) statement, notwithstanding Donelson's *pro se* status. *See Dubensky v. City of Chicago*, 2018 WL 3008589, at \*1-2 (N.D. Ill. June 15, 2018) (citing cases). Assuming the truth of those facts, and viewing them—and any inferences therefrom—as favorably to Donelson as the record and Local Rule 56.1 allow, the record on summary judgment provides no apparent ground to rule in Donelson's favor. Rather, the record indisputably shows that Hardy's screening involved several professionally appropriate assessments and revealed "no respiratory distress [or] need for an inhaler." Doc. 361 at ¶¶ 42, 57.

regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If Donelson seeks to proceed *in forma pauperis* on appeal, he must file a motion to proceed *in forma pauperis* in this court that specifies the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1).

June 29, 2018

_____
United States District Judge